Union Pacific Railroad against the regional transportation. Mr. Vincent. Good morning may I please support. My name is Josh Vincent I represent the Commuter Rail Authority of the Regional Transportation, Commuter Rail Division of the Regional Transportation Authority doing business as METRA. This is a declaratory judgment action in which we are challenging the district court's no common carrier obligation to continue providing passenger rail service on three METRA lines once its purchase of services agreement expires. It's it's very tempting to start this argument with the question of subject matter jurisdiction because our briefs have uncovered a circuit split on that question as to whether the courts have concurrent just jurisdiction over questions arising under the Termination Act or whether the Surface Transportation Board has exclusive jurisdiction over questions involving the violation but before we can get to that issue we have raised a question about whether an article 3 case or controversy has been presented in this case and we think that there is not. The party's briefs agree that the Supreme Court's decision in METAMUNE is controlling. Union Pacific contends it's this case is identical. We contend this case couldn't be more different than METAMUNE. For starters the declaratory judgment in METAMUNE involved a question of law that actually decided the party's rights and obligations under the patent license agreement. The declaratory judgment by Judge Alonzo in this case doesn't decide any right or obligation of the parties under the contract purchase of services agreement whatsoever. All it affects is the party's have according to the complaint is an impasse that has been reached in contract negotiations between Union Pacific and METRA over the cost of Union Pacific continuing to provide service and of course Union Pacific wants more money that METRA is willing to pay and METRA responded by saying that if they don't reach an agreement Union Pacific will nonetheless owe an obligation to What if Union Pacific sent METRA a letter saying that we don't believe that we have an obligation to continue passenger service on these tracks and so therefore we will cease our operations in seven days. See you later. Yep. Okay. Sounds a lot like the last case. And so would that be sufficient to create a controversy? No I don't think it would your honor because there's too many. So you need so you need to wait to have Union Pacific actually on that day say okay we're done. Yes I think that's what it would have to come down to and I think part of the problem here is that they're you know the metamune case. So the main use of the declaratory judgment act since its enactment is forbidden. Somebody says I would like to do X and they say they'll arrest me if I do X. Please give me a declaratory judgment that I'm entitled to do X. Judge it's a that's a perfectly normal lawsuit. I totally agree I mean that's no question that's so Union Pacific says we say we're entitled to stop service. Yes. And METRA says you're not so entitled we'd like a declaratory judgment. How is that any different from I would like to peddle my wares without a license you say you'll arrest me if I don't have a license. I don't think it's the same level of coercion. I mean that's the test it's a question of degree under metamune as to how coercive it is and at this point there's too many too many things that could happen as the district court pointed out. If they don't reach a contract METRA could take over the service. If they don't reach a contract METRA might find another entity to operate the trains. If they they may negotiate and reach a contract. The problem here is that the declaratory judgment is preventing a contract from being reached. That's ultimately what's happening here it's changing the party's negotiating position and the economic dynamic that would normally exist. I mean I can't imagine any other simple transaction where there's a merger agreement and people dispute whether something's going to be entitled to tax treatment depending on when the transaction closes. Parties don't go to the court and ask for an advisory opinion on that because they risk the fact that tax treatment might be different depending on how the case closes. I believe I've seen cases like that and these days the most common declaratory judgment action is somebody says to an insurance company you must defend and indemnify me in lawsuit X. Yes. The insurance company says no we have no such legal obligation. Yes. The declaratory judgment. Correct. There is no such legal obligation. That's right. Well here we have Union Pacific saying we have no legal obligation as a common carrier to run these trains and METRA says yes you do and here we are. I think perhaps you should move to your next point. Okay the only thing I would add to it judge is that I don't think that the declaratory in this context really is as the correct party either from the standpoint that it's really the citizens. Let's move to your next point. The subject matter jurisdiction issue. It's not a question of subject matter jurisdiction it's one of agency primary jurisdiction which is not subject matter jurisdiction but it is important and it's something a court should raise. Do we have the view of the surface transportation board about whether it has primary jurisdiction over this kind of dispute? For purposes of the declaratory judgment the surface transportation's board jurisdiction would be discretionary. That's different but for purposes of a violation. I asked a concrete question and I wish you'd answer the question I asked. Sure. Do we have the view of the surface transportation board about whether it has primary jurisdiction over a dispute like this? No I don't believe we do. What what then do you make of the surface transportation's board's order on July 22nd 2020 granting Union Pacific's motion to hold the proceedings in abeyance? Well as I said I think that with respect to a declaratory judgment the board's jurisdiction is discretionary and that's the basis on which it dismissed it. That order doesn't seem to exclusively be about a declaratory judgment. It seems to say we are willing to wait because the district court might grant Metro's motion. The district court might resolve the common carrier issue. We don't need to it might eliminate board action. That sounds to me like an acknowledgment of concurrent jurisdiction. Why do you read it differently? I read it differently because the DC Circuit's decision in McCarty versus surface transportation board found that the courts have no disputes under the Termination Act. The jurisdiction of the agency. A decision of the DC Circuit and three dollars will get you a cup of coffee at Starbucks. The question I asked, the question Judge Jackson Cumey asked is do we have the definitive position of the surface transportation board? No I don't. You might think it's and then could you help me because I didn't see your answer to her question about why that 2020 ruling is not sufficient. Because I because as I don't know how else to answer it judge other than to say that the I view the surface transportation's board decision as simply a refusal to exercise its discretion. It characterized the matter before it as being discretionary as to whether it had to hear it or not and it decided not to and to defer. Well then do you think we need an amicus brief from the surface transportation board? I certainly would welcome one. I think that in this case. Why do you think it would say anything different from the 2020 order? Because I think it would have it we would have an opportunity to talk to the surface transportation board about what we view as the correct interpretation of sections 10501 and 11704 in terms of establishing exclusive jurisdiction in the agency for any dispute that arises under the Termination Act and the court's role is really only the enforcement of the consistent with the history of how the term how the form of the Interstate Commerce Act and now the Termination Act have been applied over the years. The court since as early as night Supreme Court since 1907 in the Abilene Cotton case found that although it was characterized then as primary jurisdiction that in every instance when you trace that all the way through from 1907 to 1966 the courts have deferred to the transportation the agency in these circumstances for purposes of questions of interpreting the act or applying the act and and found that the court's role is appropriately to wait in advance and to enforce and what I think Congress did when it enacted first 11704 in 19 well 11705 in 1978 and then 10501 was to establish make it very concrete that the practice in which the courts were then engaged which was to allow the agency to make the determinations in the court's role to enforce it was made concrete with those two provisions in 1978 in 1980 and I think that that's why the DC Circuit case is is basically on point in terms of deciding under the plain language of the statute and this is a plain language question that arises under the Termination Act as to what these terms mean I mean this would read the word exclusive right out of 10501 there's a reason it says exclusive and it doesn't say exclusive primary and that's sort of along the lines of what the Fifth Circuit tried to say in the Ilan case where it defines exclusive primary to mean it's the only place where there's primary jurisdiction but that's in this reading of it there's you know there's either exclusive jurisdiction or there's primary jurisdiction and Congress chose the word exclusive for purposes of deciding violations under the Termination Act with respect to enforcement it made it very clear that enforcement takes place in the court and that's the court's role and when you look at the cases that Union Pacific is relying upon here which is the Pachovsky case out of the First Circuit there's two problems with that first it did not consider the DC Circuit's decision that overlooked it McCarty Farms decision and second it misreads section 11704 because 11704 when it you know to enforce liability against a carrier it reads that to mean to sue for a violation and that is not the natural reading in the context of this particular statute it's to enforce a liability found by the STB under 10501 there's no redundancy the court said that this was ambiguous and there's a redundancy in 105 c1 and c2 I'm sorry 11704 c1 and c2 but there's no redundancy there it talks distinctly about a difference between enforcing a liability and enforcing damages they are not the same and when you look at how the statute statutory language has evolved there is a clear modification of what was formerly section 9 then became 11705 now 11704 it was originally saying for the recovery you could bring an action in either the agency or the court for the recovery of damages for which such carrier may be liable whereas now it says simply to enforce liability and those are very distinct concepts so to go back to your question I think that the I feel confident the Surface Transportation Board with with some input from us would find correctly that it's age its jurisdiction is exclusive over any interpretation or application of the Termination Act and that the court's role is limited to enforcement of it I think what's what's happened here is it's become you know it's really come full circle the practice of the and letting the agencies decide it and playing the role of enforcement has been made concrete by the by the by the Congress with those two enactments in 1978 and 1980 which are now part of the Termination Act the merits on the merits of this case if you reach the merits and I don't I don't believe the much like the subject matter jurisdiction question straight-up issue of statutory interpretation the section 111 0 1 of the Termination Act provides that a rail carrier providing transportation or service subject to the STP's jurisdiction quote shall provide the transportation on reasonable request 10903 which is the discontinuance provision provides a general rule it says an abandonment or discontinuance may be carried out only as authorized under this chapter and there are only two authorizations under this chapter one is to abandon any part of a line and one is to discontinue all transportation over any part of a line there is nothing in the statute that says a carrier is authorized to keep a line and shed services piecemeal or discon partially discontinue service over that line whether it's passenger what is it in the statute that forbids that it used to be forbidden by section 10908 but that was repealed correct so it's forbidden because the Congress removed the authorization for the STP to allow a partial discontinuance yep but what forbids a railroad from discontinuing a particular service over a line that remains in use the STP has no authority no allow it that just may mean the Surface Transportation Board is out of that business just like the Civil Aeronautics Board is now out of the business of telling airlines which city pairs they must serve what is it in the statute that forbids a railroad from deciding for example not to run the five o'clock freight train that it used to run every day I think it's the the way Congress has structured this your honor is that you cannot allow the railroads to piecemeal shed services to the point where what is it in the statute that says that that's the question right 10908 and 10909 used to say that correct we all agree they've been repealed correct so one now looks for something in the statute that says that well I don't think that Congress needed to explicitly say they can't do it they removed the authority to allow it to happen and I think you know when Congress I think a good example of when I take it your answer is nothing I'm asking you to point to something in the statute that forbids it forget about passenger service forget about common carrier a railroad for 50 years has run two freight trains a day over a particular stretch of track it's the okay just listen to the question sure and it decides it will now run only one freight train over that stretch of track does that need federal permission is it required to continue to provide it under 1101 under the common carrier obligation which requires it to continue providing you're begging the question I don't I'm not I'm not assuming a premise here your honor I am assuming or I'm not I'm reading the statute as written that 1101 imposes a common carrier obligation that the common that the common carrier cannot simply rid itself of without authorization from the board and the board has removed any authority to allow that type of partial discontinuance and if you allow that to occur then you create a situation where for example in the Chicago area railroads would be able to say well we're gonna stop carrying steel we're gonna stop carrying wheat we're only going to carry grapes what is it in the statute that forbids that the absence of authority the language that change here that an abandoned and or continuance may only be carried out as authorized under this chapter you're not find abandonment your way rather than the way that the ICC and the surface transportation board have defined it since 1887 as ending all service on a line well that's and that's really this was not a big problem right earlier that's before 1995 if a railroad wanted to reduce the number of trains from one to two it could it needed no federal permission whatsoever well why do you think it now needs federal permission that's what puzzles me I think 1995 is a deregulatory step and your argument is that by removing two sources of federal regulation Congress actually increased the amount of federal regulation and indeed all together forbade certain kinds of private decisions I you know I think that the deregulation ended in 1995 to be honest with you I think from during that period of time that Congress created the ability I guess my question is to get out of the service the word abandonment is a word with a long long history in railroad regulation yes and you don't appear to be using it the way it's been used since 1887 I mean why why does abandonment now have your special meaning because at this point in time the Congress has limited the no that's why I say you're begging the question I said why does abandonment have your special meaning and you said that's because abandonment has my special meaning because you just used abandonment your way abandonment since 1887 meant pending all service over a line correct Union Pacific doesn't propose to abandon a line in that sense it proposes to give up to cease a abandonment given the history of the meaning of that term well because now at this point in time the statute oh I'm sorry I mean you may feel this is circular your honor but the the point is is that the statute provides that there can only be a total abandonment at this point there is one relief valve and that's 105 oh two if Union Pacific wants to shed a portion of its passenger service then that's the option that it has it can go to the surface transportation board and seek an exemption under one has the surface transportation board ever used the word abandonment as you are using it in this litigation you know it's it's the successor of an agency that began in 1887 the very first federal agency and you would think that sometime between 1887 in 2022 if your position is right the agency would have said that by means any change whatsoever reducing service to any extent I'm not aware of any such declaration by the agency as long as we're asking questions I didn't understand what the question was all right I think we're done mr. Dupree good morning thank you judges to Brooklyn may please the court Tom Dupree on behalf of Union Pacific nothing in the law imposes a common carrier mandate on Union Pacific that would compel us to operate mattress trains once the contract between the parties has expired to begin with Union Pacific is not a common carrier of passengers let me ask you the two first do we have the views of the board on this issue we do your honor document 62 ECF district court docket that is the decision in which the surface transportation board or excuse me that's the district court decision reporting on the surface transportation boards decision to hold the case in abeyance rather than exercise primary jurisdiction Metro went to the surface transportation board and basically said we want you STV to decide this in lieu of the district court the surface transportation board says no district court is exercising jurisdiction there's concurrent jurisdiction between the board and the district court and we are going to hold our fire and let the district court decide this then in documents and then presumably second guess the district court well I don't think let's see if we can render the where we are it's it's it's not that sort of agency I think what the surface transportation board was simply saying is district court as concurrent jurisdiction it's not something within its primary jurisdiction because primary jurisdiction typically concerns highly technical granular detailed questions which this is not this is a pure question of law about the extent of the common carrier obligation but your honors question judge Easterbrook where you said is it worth soliciting the STV for an amicus brief that's in fact what district court did that's document 62 the district court citing this court's precedent said it may be helpful to get an amicus brief if the surface transportation board has a different view the district court said I am inferring from the STVs decision that it's happy allowing this court to exercise jurisdiction otherwise it wouldn't have held the case in abeyance but out of an abundance of caution in case I'm mistaken and pursuant to this court's precedent let me invite the surface transportation board to weigh in with its own amicus brief if I'm mistaken about that and they never did so I think in honor answer to your honors question we know the STVs view on this it couldn't have been clearer if the district court made the exact invitation this court contemplated the STV declined the invitation there's no question what the STVs view of this is let me address the all right by my second principle question is has the surface transportation board or its Commission use the word abandonment to mean reduction of service on a line rather than ending service on a line no your honor I too was very puzzled by my friend's argument it never has that's not what abandonment means your honor hit the nail on the head has never is a long time have you done a search I cannot say I have I will tell you I used to be the Interstate Commerce Commission's a lot of things since it was created in 1887 you really need to do a search on this so I'm asking if you've done a search let's see I I have not precisely because abandonment at least the way that the courts have described it there's a judge Kavanaugh opinion as the DC Circuit where he described it I mean is your honor recognized it's a term of art in railroad law it has a fixed meaning I am certainly not aware of any decision you know in the 1800s 1900 to any point where there's been a different meaning given to abandonment I mean I think the plain English version of abandonment means you abandon something that's not what we're doing here plain English is the very last thing one would think of in dealing with the Interstate Commerce Commission Act and its successor they didn't seem capable of resolving any dispute in fewer than 200 pages it was just not in their their power let me ask you this counsel what section of the ICC TA do you rely on any claim that you have no obligation to in claim that your obligation to provide passenger service was eliminated in other words are you and your friend on the other side merely on the other two sides of coin here no your honor and if I could answer your honors question in two parts the first is that our primary point and I think frankly the easiest way for this court to resolve that question is to look at the 1995 decision of the ICC in which the ICC said the Chicago Northwestern our predecessor is not a common carrier of passengers full stop this issue was litigated by Metra which by the way that was the position they were advancing that we're not a common carrier so that's the first point if hypothetically there were some residual common carrier mandate that could have survived that again I don't see how it could since the ICC definitively decided this very question in 1995 I think it would go to judge Easterbrook's point which is that historically or at least in the period in the 1960s and I did prior to ICTA you did need prior to what it was an acronym your honor I failed the test the Interstate Commerce Commission termination act just refer to it as the act the act prior to the act as judge Easterbrook noted a carrier if they wanted to discontinue part of a service or stop providing passenger services needed to go and get permission when Congress enacted the act in 1995 it says you have to provide this passenger service there's nothing that says in order to divest yourself of the passenger service you have to get permission from the government so it you know in essence both of you are relying on the absence of a provision but it just in different ways let me ask you this if we don't buy your claim that passenger and freight obligations are severable in the statute I think that's really at the core of what you need to but if I could if I could just quickly respond when you said we're two sides of the same coin I guess with respect I would I would see it differently in that in that I think the background rule here is that just as a general matter of law a company is not forced to engage in some sort of business or service absent some sort of government mandate that it did and that it does and so if the law is totally silent in other words if they can't even point to a provision in the law saying you have to pass this service have to offer this service that's the end of the analysis in other words I don't think the background rule in American law is unless the government says you don't need its permission not to do something you're forbidden from doing it no we are entitled to terminate passenger service unless there's something in federal law that requires us to provide it or says you can only provide terminate it under certain circumstances so so again that's why I don't think we're quite the same they don't even come up with that threshold point putting this common carrier burden on us so we don't even get to the question of well can you point to something that says you can you can release yourself from it. With regard to your honor's second question about freight and passenger here too I think and I'm sure Judge Easterbrook will weigh in if I have this wrong but I think it has been very well settled historically that the common carrier obligation separates freight common carrier obligations from passenger common carrier obligations and so even if you are a carrier that is offering freight services that obligation doesn't then require you to also offer passenger services and vice versa so it's it's a different thing we are a freight common carrier to be sure but the critical point and the question before this court is are we a passenger common carrier and I think the answer to that is clearly no certainly that was the ICC decision in 1995 which I would think is binding on this court. Counsel how do you address the concern raised by Metro with regard to the fact that if we accept your proposed interpretation of the act that that would allow basically piecemeal discontinuances to add up to total abandonment is there a limiting principle there? Well like today you know UP says okay we're gonna stop offering passenger service and then you know we'll keep a little bit of our freight service but we're gonna get rid of most of it you know is is there what would would provide any sort of limitation of Metro basically just eating away all of the service until there's very little if you point your honor the first is that I think it would be a mistake to assume that even if you had a situation where one railroad was discontinuing particular trains that there would be kind of a trainless gap as it were in other words even if the court were to rule in our favor in this case that doesn't mean that there's going to be no longer any commuter service on these lines I mean to the contrary I mean Metro in all likelihood will continue providing the service just using a different independent contractor to provide I guess that's not my question I'm you're you're talking you're the perspective of the consumer I'm asking the question from the perspective of UP as a business entity it says look you know we can't get rid of abandon our services on this line but you know what we can just eat away at it till it's basically down to nothing what is allows what would limit the UP from doing that I think the common carrier mandate at least on the freight side certainly would in other words in your honors hypothetical let's say Union Pacific shipped you know 20 types of commodities and again to your honors hypothetical said we want to chip away piecemeal at this and you know we want to stop carrying you know barley we want to stop carrying this commodity chipping away piecemeal I think at some point maybe early on in the process the common carrier mandate would come in because the common carrier mandate again freight carriage would say you're not allowed to discriminate in that way if you have a reasonable request for services you are reasonably required to provide it and that sort of thing so I think that would be a backstop to your honors concern that we would kind of whittle away so at the end of the day we would be carrying only you know the single most profitable commodity quite the contrary I think the common carrier mandate would provide a backstop to the precise concern your honor articulated so if we find that UP upon these facts is a common carrier of passenger service and we agree with Metro on that point then UP would not have the ability to discontinue its passenger service without getting permission from the STB no your honor in other words if hypothetically you were to find again contrary to all reason in the ICC's decision that we were a common carrier I think to judge Easterbrook's point that we are free under the act as it currently exists to discontinue that service the passenger service and as long as we stop short of a total discontinuance or an abandonment but I guess I'm confused then I thought the would provide a backstop to you stopping a particular if you're a common carrier of say freight service or passenger service of completely discontinuing it altogether it depends on the type of hype your honors hypothetical in terms of a piecemeal dismantlement in other words the hypothetical that I was engaging with was the hypothetical where a carrier wanted to kind of you know stop transporting particular commodities piecemeal to get the most profitable one the hypothetical your honor posited would be if we had both freight and passenger is there anything that would complete us that would prohibit us from divesting passenger while maintaining the freight the answer to that is now the answer that is no but again I that's entirely consistent with the act that Congress provided and of course the court doesn't even need to reach that question because we're not even a common carrier to begin with I'm I'm interested in something you said in response to judge Lee which is that if Union Pacific gets out of this business Metro is free to run trains itself or requires some third party to run them does Union Pacific agree that it has an obligation to let Metro use its track I don't think there's a legal obligation to make it use its track but it's it's would be but there is doubtless a price at which Union Pacific will find this profitable obviously Metro would have to pay you know reasonable fees for using our tracks which are also used in freight service but what is reasonable fee mean well this is this is getting you know above my knowledge level in terms of the amount that they're charging but my point is that there isn't I don't think there would be any concern of the parties not ultimately being able to reach an agreement at least in the sense that Union Pacific Metro already has agreements in place with other carriers in the Chicago area on their line so these are precisely the types of by statute to negotiate so that sort of framework in which Metro operates trains on tracks that are owned by freight carriers is extremely common I think the presence of this dispute today shows that Metro is very obviously concerned about having to reach an agreement with Union Pacific to use its rails while Metro takes over operation itself or contracts with a third party to do so they'd much rather have you all keep doing it that's why they're struggling so hard so I I don't know if I would go that far well I I agree that they would like us to continue to continue doing it but I think that stops short of saying well and if you are unable to reach an agreement do you Union Pacific have a legal obligation to continue providing those services you can see the problem if if it is not possible for Union Pacific and Metro to reach an agreement for Union Pacific to continue running the train running mattress stock why would it be any easier to reach an agreement about the price Union Pacific would charge Metro to operate its own stock over this line well the same way well I guess a couple points your honor I guess the the first point is that I think the parties would agree that one of the the reasons why the negotiations over a new contract reached an impasse is because of the disagreement over this legal issue about whether you have a continuing obligation to do it regardless of whether you have a contract I hate to use the words here since we are not officially in law school but the words Coase theorem come to mind the rule of law doesn't really matter as long as the price term is open there if there is a price that metric can pay to run its trains over Union Pacific's track then there is a price it can pay for Union Pacific to run its trains over its track why are these two things any different well again I think metric clearly has a preference all other things being equal which they may not to continue having Union Pacific operate its trains Union Pacific does not want to continue to operate mattress trains and you're not answering my just a business question in which the business people have not confided in their lawyer I wouldn't rule that possibility out judge Easterbrook but I would also say that in this case I think the question before this court is whether to affirm the declaratory judgment issued by the district court namely whether we have a common carrier obligation and I think regardless of the state of negotiations or how this will play out or the optimum price I think the answer to the question that is before this court is abundantly clear we have no common carrier obligation period if we did hypothetically have some sort of common carrier obligation that was somehow inherited from our predecessor notwithstanding the ICC's decision that they were not a common carrier themselves I think there's nothing in the law in the act or anywhere else in federal law that would prevent us from discontinuing passenger service without seeking government permission so as to that question before the court again we simply ask this court affirm the declaratory judgment of the I understand the argument that METRA is saying the power to authorize the discontinuation of passenger service has been repealed so the board can't authorize the discontinuation of the service if that is right then presumably METRA will be able to compel Union Pacific to run its trains for an annual payment of 10 cents right because Union Pacific can't stop and 10 cents is better than nothing the business case for that would need to be made out but that seems to be METRA's legal position if Union Pacific cannot stop we don't have to pay it a market price again I don't know what METRA's ultimate position is I mean I think at some point you're probably getting to Fifth Amendment territory candidly if METRA is going to say that we have a right to take your property and use your property for something that falls dramatically below actual compensation so I'd be surprised if the Tucker Act would treat this if it is a taking it would be a taking by the United States for denying Union Pacific the power to abandon and there would be a remedy against the United States in the Court of Federal Claims that's the holding of the Regional Rail Reorganization Act cases in 1975 as I said I was once the Commission's lawyer I appreciate that your honor and I am hopeful we will not reach that point but unless there are any further questions either as to the jurisdictional questions or as to the common carrier substantive questions we would simply ask that this court affirm the judgment of the district court all right well thank you very much the case is taken under advisement